Mark J. Perry, CA Bar No. 212532
Gibson, Dunn & Crutcher LLP
1050 Connecticut Ave. NW,
Washington, DC 20036-5306
Telephone: 202-887-3667
Email: MPerry@gibsondunn.com

Margaret A. Little (*pro hac vice pending*), CT Bar No. 303494
Caleb Kruckenberg (*pro hac vice pending*), PA Bar No. 322264
New Civil Liberties Alliance
1225 19th Street NW, Suite 450
Washington, DC 20036
Telephone: 202-869-5210
Email: peggy.little@ncla.legal
Email: caleb.kruckenberg@ncla.legal

*Counsel for Raymond J. Lucia Companies, Inc. and Raymond J. Lucia, Sr.*

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RAYMOND J. LUCIA, COMPANIES, INC. and RAYMOND J. LUCIA, SR., <br><br> Plaintiffs <br><br> v. <br><br> U.S. SECURITIES AND EXCHANGE COMMISSION, JAY CLAYTON, in his official capacity as Chairman of the U.S. Securities and Exchange Commission, and MATTHEW G. WHITAKER, in his official capacity as Acting United States Attorney General, <br><br> Defendants. | CIVIL ACTION NO: '18 CV2692 DMS JLB <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** |

Raymond J. Lucia Companies, Inc. (RJL) and Raymond J. Lucia, Sr. (Mr. Lucia) for their complaint against the United States Securities and Exchange Commission (SEC or the Commission), Jay Clayton, in his official capacity as Chairman of the U.S. Securities and Exchange Commission, and Matthew G. Whitaker, in his official capacity as Acting United States Attorney General, allege as follows:

**Preliminary Statement**

1.      This action arises from the SEC's attempt to subject Raymond J. Lucia Companies, Inc. and Raymond J. Lucia, Sr. to an unconstitutional administrative proceeding before an Administrative Law Judge (ALJ) whose appointment violates Article II of the United States Constitution.  In violation of the President's removal power, SEC ALJs may only be removed for good cause as determined by the Merit Systems Protection Board (MSPB), 5 U.S.C. § 7521(a), whose members themselves can only be removed by the President for good cause. 5 U.S.C. § 1202(d).  SEC Commissioners, who have powers of appointment over ALJs, cannot act without approval from MSPB and themselves enjoy for-cause protection against removal.  *MFS Sec. Corp. v. SEC*, 380 F. 3d 611, 619-20 (2d Cir. 2004).  These multiple layers of tenure protection violate Article II of the United States Constitution.

2.      RJL and Mr. Lucia already underwent one unconstitutional administrative proceeding commenced in 2012 that they litigated all the way to the United States Supreme Court before the constitutional claim that the ALJ in that action had not been constitutionally appointed was decided—in his favor—by the highest court in the land.

3.      Although the SEC could have lawfully brought those 2012 proceedings either in a federal district court or before the Commission, it chose to bring them before an unconstitutionally appointed ALJ.

4.    In the 2012 proceedings, the SEC maintained a litigation position so erroneous that the Department of Justice took the extraordinary step of confessing error before the Supreme Court.

5.    The SEC is now reinstituting proceedings before an ALJ whose appointment is still unconstitutional, thereby subjecting RJL and Mr. Lucia to years of protracted litigation and appeals before they will be before a court that has jurisdiction to hear their claims.

6.    Further, the SEC is proceeding in violation of its own rules, deadlines and procedures, which violates RJL's and Mr. Lucia's right to due process under law and, due to the passage of time, gravely prejudices his ability to defend himself in the reinstituted proceedings.

7.    The grant of jurisdiction under Article III of the United States Constitution and 28 U.S.C. § 1331 requires this court to determine these constitutional questions before that administrative action proceeds.

8.    This Court offers RJL and Mr. Lucia their only opportunity for meaningful judicial review that could prevent these deprivations of their constitutional rights.

**Parties**

9.    Plaintiff Raymond J. Lucia Companies, Inc. (RJL) is a California corporation located in San Diego, California.

10.    Plaintiff Raymond J. Lucia, Sr. (Mr. Lucia) was a registered investment advisor associated with and the sole owner of RJL.  Mr. Lucia is a resident and citizen of California residing in San Diego.

11.    Defendant United States Securities and Exchange Commission (SEC) is an independent agency of the United States government headquartered in Washington, DC.

12.    Defendant Jay Clayton is the Chairman of the United States Securities and Exchange Commission.  He is sued in his official capacity.

13.     Defendant Matthew G. Whitaker is the acting Attorney General of the United States, and the head and principal officer of the United States Department of Justice. He is sued in his official capacity.

## Jurisdiction and Venue

14.     This action for declaratory and injunctive relief is brought under the grant of jurisdiction in Article III of the United States Constitution and 28 U.S.C. § 1331, which provides that federal district courts "have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States," and 28 U.S.C. § 2201, which authorizes declaratory judgments.

15.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1337, 1346, 1651, 2201 and 5 U.S.C. §§ 702 and 706. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) and (e).

## Factual Background

### *RJL and Mr. Lucia's Business*

16.     Raymond J. Lucia was a financial planning professional who for nearly 40 years had an unblemished record in his chosen profession.

17.     Ray Lucia spent four decades building a successful family business, RJL, that eventually came to employ his four children, brother and nephew and approximately 100 hardworking, well-paid individuals.

18.     Ray Lucia's businesses also included highly successful media ventures, including his own radio show, television and media appearances, all built upon his spotless reputation, name recognition and prominence in the financial planning profession.

19.     To market his business and educate potential clients about his work, Mr. Lucia and RJL held free seminars for prospective clients that promoted a retirement planning strategy he called

"Buckets of Money" (BOM), which urged retirees and pre-retirees to diversify their assets into buckets of safe (*e.g.* CDs, bonds, annuities etc.) and buckets of riskier investments (*e.g.* stocks, real estate).  That strategy informs retirees that when income is needed, they should withdraw from the safer investments first, allowing the riskier investments time to grow, thus mitigating the sequence of returns risk of having to potentially liquidate riskier assets if the stock market goes negative for an extended period early in retirement.  Numerous academic studies have supported the efficacy and superiority of this concept.

20.     In all their regulated activities, Mr. Lucia and RJL rigorously followed all SEC rules and regulations, its strict requirements, and used no promotional materials that had not been submitted for prior written regulatory approvals by broker-dealers registered with the Financial Industry Regulatory Authority (FINRA) or the SEC.

21.     Mr. Lucia used a slideshow in his seminars comparing outcomes for hypothetical investors using different strategies accompanied by contemporaneous explanations and drawings on an overhead that elucidated his recommended strategy, followed by a period of unscripted audience questions and answers.

22.     Two of the 126 slides in his show used the term "back test" to describe a comparison between actual historical stock market returns and a hypothetical portfolio using hypothetical assumptions regarding inflation and rates of return on real-estate and non-stock investments that followed Mr. Lucia's method.

23.     All of the slides showing examples—including the two "back test" slides—contained prominent disclaimers such as, "This is a hypothetical illustration and is not representative of an actual investment" and "Rates of return are hypothetical in nature and are for illustrative purposes only."  These disclaimers appeared nearly 50 times throughout the presentation.

24.     In addition, Mr. Lucia's oral presentation (confirmed in a webinar, the only evidence of what was actually communicated to Mr. Lucia's audiences), repeatedly urged attendees to read the many disclosure slides, while warning the audience: "Understand nothing can be guaranteed…" "Understand we can't guarantee rate of return.  No one can…" "Now remember all the disclaimers on the screen.  Very important that you understand nothing here is guaranteed…  Once again, understand the disclaimers."

25.     In all of his seminars and webinars, Mr. Lucia expressly and repeatedly reminded his audience that these were hypothetical illustrations—using hypothetical, pretend, assumed rates of return—and identified clearly where he was not using actual historical data in his assumptions.

26.     All of the slides used in his free seminars, including the ones that used the term "back test," had been submitted, reviewed and pre-approved by broker-dealers registered with the Financial Industry Regulatory Authority (FINRA) 20-30 times per year over the course of 2004 to 2010.

27.     In addition, Mr. Lucia was hired by other broker dealers, including two public company broker-dealers, to present the identical BOM seminars numerous times.  On most of these occasions, the broker-dealers were provided the slide shows in advance of the seminar, and none of their compliance departments took issue with the slides, the presentation or the back tests.

28.     In 2003, the SEC reviewed a similar version of the full slide show, including the two slides that used the term "back test" and the SEC examiners raised no concerns that they were misleading.  Indeed, the 2003 examiners specifically concluded that RJL "does not advertise performance," and took no issue with Mr. Lucia's use of assumptions in a back test.

29.     In March 2010, the SEC conducted an examination of RJL, but did not bring an Order Instituting Proceedings (OIP) against RJL and Mr. Lucia until September 5, 2012.

***No Losses or Harm to Any Client, Seminar Attendee or Investor***

30.     The OIP did not claim that any investor money had been misappropriated or that any investor account had been mishandled or cite to any sales practices deficiencies.

31.     No SEC examination ever claimed any investor complaints or losses, nor did the OIP that led to the end of Mr. Lucia's ability to engage in his chosen profession.

32.     No securities were offered or sold at Mr. Lucia's presentations.

33.     None of the nearly 50,000 potential investors who attended the seminars at the time these "back test" slides were in use filed a complaint with the SEC alleging that the slides were misleading.

34.     Upon receiving notice from the SEC in 2010 that the agency now objected to those slides, Mr. Lucia and RJL immediately ceased using any and all material of any concern to the SEC, including the slides in question, and Mr. Lucia voluntarily removed all three of his books from circulation.

***The Charges Against RJL and Mr. Lucia***

35.     Nevertheless, in the 2012 OIP the SEC charged that Mr. Lucia violated the securities laws by using the word "back test" when describing a strategy that combined actual historical data for stock-market returns with hypothetical assumptions about inflation and returns on non-stock investments.

36.     The word 'back test" is undefined in the law and SEC regulations, and it had never before been construed in any judicial or administrative proceeding.  Nor had Congress or the Commission ever given fair notice that either would regulate its usage.

37.     "Back test" is a term commonly used in the financial planning industry to mean a 'look back" at how a strategy would have performed subject to various hypotheticals and assumptions.

It is not used in any strictly defined way in the industry and has multiple applications in both financial services and academia.

38.     Mr. Lucia fully and repeatedly disclosed in his seminars exactly how he was applying the term "back test."  He made perfectly clear what assumptions, hypotheticals, and/or actual data were used in his back tests.

39.     The SEC enforcement division insisted that a "back test" must rely exclusively on historical data—even when a presentation explicitly discloses that hypothetical assumptions are being used, even after their expert viewed marketing material from a trillion-dollar mutual fund company, with fifty million investor shareholders, advertising a back test that used a hypothetical inflation rate.

### The Proceedings Against Lucia

40.     In 2012, the SEC had the option of bringing its enforcement proceedings under the Securities and Exchange Act of 1934 and the Investment Advisers Act of 1940 against Mr. Lucia either in federal district court or in an administrative proceeding.  It elected to institute proceedings against RJL and Mr. Lucia before an unconstitutionally appointed administrative law judge, Cameron Elliot.

41.      At the time, ALJ Elliot had not been appointed by the Commission.  Instead, he and the other SEC ALJs were apparently appointed by the Chief ALJ, not by a constitutionally authorized officeholder.

42.     ALJ Elliot, to whom the division presented its arguments, is reported at the time of Mr. Lucia's hearing to have "found the defendants liable in every contested case he has heard" and, on information and belief said to "defendants during settlement discussions on a case they should

be aware he had never ruled against the agency's enforcement division." *See* Jean Eaglesham, *Fairness of SEC Judges Is in Spotlight*, Wall St. J. (Nov. 22, 2015).

43.    ALJ Elliot has also admitted publicly that he had "never given less than a permanent bar" to anyone who contested the charges against them.  *Id.*

44.    For their hearing before ALJ Elliot, Mr. Lucia and RJL had scheduled witnesses to provide testimony on their behalf. However, days before these witnesses were scheduled to testify, the SEC's enforcement division served them with subpoenas demanding production of all their financial records, in every format, from any source, over a five-year period, subject to the penalty of fine and/or imprisonment.  Subsequently, the witnesses declined to appear on Mr. Lucia's behalf. As a result, ALJ Elliot never heard evidence from witnesses favorable to RJL and Mr. Lucia.  The witnesses even wrote a letter to ALJ Elliot complaining of the eleventh-hour intimidation, but Elliot refused to enter it into the record.

45.    On July 8, 2013, ALJ Elliot issued an order revoking Plaintiffs' investment adviser registrations and barring them from the industry for life even though the record lacked any evidence of either customer complaints or losses. *In the Matter of Raymond J. Lucia Companies, Inc.*, Initial Decision Release no. 540.

46.    In reaching his decision, ALJ Elliot admitted that he was adopting a new definition of "back test." Specifically, he wrote that Plaintiffs' use of the term "back test" was misleading because it did not "meet the definition of 'back test' that *I have adopted." In the Matter of Raymond J. Lucia Companies, Inc.*, Initial Decision Release no. 540, at 30 (Dec. 6, 2013) (emphasis added).

47.    Mr. Lucia's use of the term "back test" was held to violate the securities law—even though it was used throughout the industry as Mr. Lucia used it. This was the first time the SEC

had ever held that using the term "back test" in a hypothetical illustration —a term often used both before and since Mr. Lucia's proceeding—violated the securities laws and constituted fraud.

48.     Citing the "substantial financial success" that Mr. Lucia and his company had supposedly "enjoyed at their clients' expense," ALJ Elliot also ordered $300,000 in civil monetary penalties against Plaintiffs. *In the Matter of Raymond J. Lucia Companies, Inc.*, Initial Decision Release no. 540, at 60.

49.     There was no evidence, much less a finding, that the conduct at issue caused *any* client complaints or investor losses.  Nor was there any evidence that RJL and Mr. Lucia profited at the expense of their clients.  Indeed, ALJ Elliot made no findings that any of Mr. Lucia and his company's clients were harmed and pointed to no evidence of any such harm.

50.     On September 3, 2015, the Commission entered an order affirming ALJ Elliot's decision. Despite the lack of any evidence of harm to consumers and any evidence that anyone was misled by Mr. Lucia's presentation, the Commission entered an order that essentially adopted ALJ Elliot's findings and penalties imposing a lifetime ban on Mr. Lucia and RJL, revoking Mr. Lucia's and RJL's investment adviser registrations, and imposing a penalty of $250,000 on RJL and $50,000 on Mr. Lucia.

51.     In the Commission's only written dissent of 2015, two out of five Commissioners pointed out a critical flaw in the ALJ's and the Commission's decisions.  The dissenters explained that the majority had "create[d] from whole cloth specific requirements for advertisements that include the word 'back test'" and then deemed it misleading "if a back test fails to use actual historical rates—even if the slideshow presentation specifically discloses the use of assumed rates for certain components."  *In the Matter of Raymond J. Lucia Companies, Inc.*, Securities

Act of 1934 Release No. 75837 (Oct. 2, 2015) (Commissioners Gallagher and Piwowar, dissenting).

52.     The dissenters also noted that Article III courts should decide the Appointments Clause constitutional questions. *Id.*

53.     Plaintiff appealed the Commission's decision to the DC Circuit.  On October 22, 2015, the Commission stayed the civil penalties imposed on Plaintiffs pending appeal. However, the Commission refused to stay Mr. Lucia's lifetime ban from the industry or the revocation of Plaintiffs' respective registrations.

54.     On August 9, 2016, the United States Court of Appeals for the District of Columbia Circuit affirmed the Commission's order.  *Raymond J. Lucia Companies, Inc. v. S.E.C.*, 832 F.3d 277 (D.C. Cir. 2016).

55.     This was the first time that RJL and Mr. Lucia were before a judicial authority.  In its decision, the circuit court noted that its review is "deferential," with the Commission's conclusions to be set aside "only if arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*, 832 F.3d at 289-90.  As to Mr. Lucia's appeal of the lifetime ban, "a most serious sanction," the DC Circuit reviewed its imposition under an "especially deferential" standard, and left this most draconian, career-ending ban in place "even without investor injury." The Court refused to consider like cases where the lesser sanction of censure and monitoring was imposed, because they were imposed "in settled proceedings, where the avoidance of time-and-manpower-consuming adversary proceedings[] justif[ied] accepting lesser remedies in settlement." *Id.* (internal citation and quotation marks omitted).

56.     On June 26, 2017, Plaintiffs' petition for review was denied by the equally divided Court

en banc.  *Raymond J. Lucia Companies, Inc. v. S.E.C.*, 868 F.3d 1021 (D.C. Cir. 2017) (*en

banc*).

57.     Mr. Lucia and RJL filed a petition for certiorari to the Supreme Court which was granted.

58.     On June 21, 2018, the United States Supreme Court vacated all prior proceedings because

"Judge Elliot heard and decided Lucia's case without the kind of appointment the

[Appointments] Clause requires."  *Lucia v. S.E.C.*, 138 S. Ct. 2044, 2055 (2018).

59.     Plaintiffs RJL and Mr. Lucia had to litigate the constitutionality of the Appointment of

SEC ALJs all the way to the Supreme Court just to get a constitutionally appointed ALJ.

60.     All of those proceedings have cost him everything, his livelihood, reputation, health, and

business, and put dozens of employees out of a job, and cost well over a million dollars in

defense costs and attorney fees. They have also deprived consumers of access to a proven

wealth-creation strategy.

### Orders from the SEC Regarding Appointment

61.     While the *Lucia* challenge at the Supreme Court was pending, on November 29, 2017,

the Solicitor General (SG) on behalf of the United States submitted a brief in which the SG

agreed with Lucia and RJL that the ALJ who tried Mr. Lucia's proceeding, Cameron Elliot, was

not constitutionally appointed.  The next day, on November 30, 2017, the SEC issued an order

that announced that it would "put to rest" any claim that SEC ALJs were not constitutionally

appointed by ratifying the agency's "prior appointment of" SEC ALJs.  *Order*, Securities Act of

1933 Release No. 10440 (Nov. 30, 2017).

62.      In footnote 6 of the *Lucia* opinion, Justice Kagan noted that the Court declined to

address the fully-briefed question of whether the November 30, 2017 ratification was effective

because: "The Commission has not suggested that it intends to assign Lucia's case on remand to an ALJ whose claim to authority rests on the ratification order. The SEC may decide to conduct Lucia's rehearing itself. Or it may assign the hearing to an ALJ who has received a constitutional appointment *independent of the ratification*." *Lucia*, 138 S.Ct. at 2055 n. 6 (emphasis added.)

63. On August 22, 2018, the SEC issued an order, the first paragraph of which read: "On November 30, 2017, we ratified the appointments of Chief Administrative Law Judge Brenda Murray and Administrative Law Judges Carol Fox Foelak, Cameron Elliot, James E. Grimes, and Jason S. Patil to the office of administrative law judge in the Securities and Exchange Commission. In an abundance of caution and for avoidance of doubt, we today reiterate our approval of their appointments as our own under the Constitution." *Order*, Exchange Act Release No. 83907, at 1 (Aug. 22, 2018).

64. In a document issued by the USDOJ entitled, *Guidance on Administrative Law Judges after Lucia v. SEC (S. Ct.)*, the Solicitor General suggested, "Additionally, it would be fitting for the ratifications to be accompanied by an appropriate degree of public ceremony and formality …. for example, a Department Head might re-administer the oath of office to incumbent ALJs in a public ceremony, or on record of a regular public hearing or meeting. These steps … [though not strictly necessary] will underscore that the Department Head has satisfied the purposes of the Appointments Clause by accepting public responsibility for the appointment of specific persons to the office of ALJ."

65. On September 28, 2018, the Commission responded to a Freedom of Information Act request about the steps it had taken to properly appoint its ALJs. Although the SEC has

identified 89 pages of records responsive to that request, it decided to "withhold these records in their entirety" under various exemptions including work product/anticipation of litigation.

### RJL and Mr. Lucia Today

66.     Mr. Lucia has lost the ability to make a living in his chosen profession and indeed in any profession. The word "fraud" has destroyed his reputation. His media business has been decimated. Radio stations terminated his talk show and his sponsors left. Mr. Lucia's TV and radio appearances have dried up entirely.

67.     As a result, Mr. Lucia has lost his home, investment properties, his retirement savings and any prospect of future employment. He suffered a heart attack from the stresses associated with this multilayered prosecution, through administrative hearings, to a Commission hearing, a panel and *en banc* review in the DC Circuit culminating in a successful appeal to the Supreme Court. All of this came at great cost. He assets are depleted and RJL has no assets remaining. He lives on a small pension, Social Security, and occasional gifts from his children.

68.     Although the SEC's prior decision has been set aside, it remains available in online searches, with no indication provided by the government that it is an unconstitutional nullity. His name and reputation will forever be tainted as having been sued for allegedly committing a victimless fraud by the SEC.

69.     And now the SEC wants him to start from square one in its multi-layered administrative scheme in front of another unconstitutional ALJ.

### SEC Policies

70.     SEC Commissioner Hester Peirce noted in a recent speech: "Punishing every small violation … means casting discretion aside in favor of making the SEC look tough. Violations are not all equally serious. I agree with Commissioner Michael Piwowar, who notes: 'If every

rule is a priority, then no rule is a priority … While following the 'broken windows' approach, perhaps the SEC should have changed its name to the 'Sanctions' and Exchange Commission, because it acted like a branch of the U.S. Attorney's Office for the Southern District of New York." Hester M. Peirce, *The Why Behind the No*, Remarks at the 50th Annual Rocky Mountain Securities Conference, May 11, 2018.

71.     Commissioner Peirce further expressed concern with "rulemaking by enforcement. Due process starts with telling individuals in advance what actions constitute violations of the law …. It is wrong to try to do an end run around the APA by using the enforcement process to make policy. Instead, the Enforcement Division only should bring actions based on established legal obligations." *Id.*

72.     Commissioner Peirce also observed: "The effects of an investigation or proceeding on a private party can be devastating … For the individual under investigation, professional careers, reputations, and personal relationships can suffer. As the SEC's canons of ethics put it: 'The power to investigate carries with it the power to defame and destroy.' This price is too high for violations that are minor." *Id.*

### The Administrative Scheme and the Appointments Clause

73.     The SEC may bring actions in federal district court or it may elect to seek civil penalties in administrative proceedings against an entity it finds "is violating or has violated any provision of [the Securities and Exchange Act of 1934], or any rule or regulations issued under [the '34 Act]," 15 U.S.C. §§ 77a, 77h-1(g), or the Investment Advisers Act of 1940. 15 U.S.C. §§ 80b-1, 80b-3.

74.     The SEC's jurisdiction pursuant to the '34 Act and the Advisers Act *is limited to consideration of whether conduct violated the Securities laws*—and that topic alone. *See* 15

U.S.C. §§ 78u(a)(1) ("Authority and discretion of Commission to investigate violations" of '34 Act), 80b-9 (Commission authority under Adviser's Act).

75.     The administrative process departs from federal court process in that respondents are denied their rights to trial by jury and they have far more limited discovery and depositions.  The protections afforded by the Federal Rules of Civil Procedure and the Federal Rules of Evidence are not available, with ALJs having virtually unfettered discretion over what witnesses and evidence will be allowed, including admission of hearsay and curtailing of testimony and exhibits.  Most importantly, administrative proceedings are investigated, prosecuted and judged by agency employees all beholden to the entity that has brought the charges.  By contrast, in federal court, the judge is independent, unbiased and not beholden to the prosecuting agency.

76.     All SEC ALJs have multiple levels of protection against removal.  Specifically, they can be removed only if the Merit Systems Protection Board (MSPB) finds good cause to remove them, 5 U.S.C. § 7521(a), and the members of that board can be removed only for good cause.  5 U.S.C. § 1202(d).  SEC Commissioners, who have powers of appointment over ALJs, cannot act without approval from the MSPB, 5 U.S.C. § 7521, and themselves enjoy for-cause protection against removal.

77.     This scheme violates Article II of the Constitution.

*Laws and Rules Pertaining to the Current Administrative Action*

78.     SEC administrative enforcement proceedings are governed by statutes set forth in 15 U.S.C. § 78u-3(b) ('34 Act) and § 80b-3(k)(2) (Advisers Act).

79.     These statutes require that the Commission's order instituting administrative proceedings "shall fix a hearing date not earlier than 30 days nor later than 60 days after service" of the OIP

"unless an earlier or later date is set by the Commission with the consent of any respondent so served."

80. Mr. Lucia and RJL did not waive this mandatory date for commencement of the proceedings.

81. SEC Rules reinforce this strict deadline to hold the hearing and also require that the ALJ issue an initial decision no later than 300 days from the service of the OIP. Rule 360(a)(2), SEC Rules of Practice, 17 C.F.R. § 201.360(a)(2).

82. The Commission had to commence its hearing within 60 days from the issuance of the OIP. This 60-day deadline was statutorily required. 15 U.S.C. §§ 78u-3(b), 80b-3(k). It was also required by the Commission's rules of practice. 17 C.F.R. § 201.360(a)(2)(ii). And a properly-appointed ALJ was required to issue a decision no later than 120 days after the hearing. 17 C.F.R. § 201.360(a)(2)(i). All of these deadlines have passed years ago.

83. SEC enforcement actions give the Commission power to impose monetary penalties of up to $100,000 for Mr. Lucia and up to $500,000 for RJL for *each* alleged violation of the '34 Act, 15 U.S.C. §§ 78u (d)(3)(B)(i)-(ii), and the Advisers Act, 15 U.S.C. § 80b-3 (i)(2)(C). These punitive sanctions are separate from, and in addition to, disgorgement of funds. *See* 15 U.S.C. §§ 78u-2, 80b-3 (j).

84. The Commission's ability to impose an associational ban on Plaintiffs implicates both First Amendment associational rights and their rights to engage in a chosen profession.

85. The Commission may permanently revoke a party's investment advisor registration with the Commission and forever bar a respondent's ability to even be "associated" with an investment advisor. 15 U.S.C. § 80b-3 (f).

86.     Deprivations in administrative proceedings such as these can often be more significant than even criminal sanctions. As Justice Gorsuch recently wrote,

> Ours is a world filled with more and more civil laws bearing more and more extravagant punishments. Today's "civil" penalties include confiscatory rather than compensatory fines, forfeiture provisions that allow homes to be taken, remedies that strip persons of their professional licenses and livelihoods, and the power to commit persons against their will indefinitely. Some of these penalties are routinely imposed and are routinely graver than those associated with misdemeanor crimes—and often harsher than the punishment for felonies.

*Sessions v. Dimaya*, 138 S. Ct. 1204, 1229 (2018) (Gorsuch, J., concurring).

87.     The Commission as a whole, encompasses both the enforcement entity that investigates and prosecutes alleged violations and the Office of Administrative Law Judges. *See* 17 C.F.R. §§ 200.14 (Office of Administrative Law Judges), 200.19b (Director of the Division of Enforcement).  Moreover, the Commission has the final say within the administrative proceeding concerning liability. 17 C.F.R. § 201.411.

88.     On information and belief, the SEC enjoys a 90% success rate in its own hearings but has only a 69% success rate "against defendants in federal court." Jean Eaglesham, *SEC Wins with in-House Judges*, Wall St. J. (May 6, 2015) available at http://www.wsj.com/articles/sec-wins-with-in-house-judges-1430965803.

89.     Likewise, the New York Times reported similar statistics reflecting a higher win percentage in SEC administrative hearings than in federal court. Gretchen Morgenson, *At the SEC, a Question of Home-Court Edge*, N.Y.Times (Oct. 5, 2013).

90.     Moreover, the Commission decided appeals from initial decisions "in their own agency's favor" 95% of the time between October 2010 and March 2015. Eaglesham, *supra*.

91.     These structural biases factually and statistically play out in favor of enforcement and the imposition of liability.  Plaintiffs have already endured an extended administrative hearing in

front of an ALJ beholden to the same entity that employs him, promulgates, interprets and/or ignores its own rules. Further its enforcement division is prosecuting RJL and Mr. Lucia. The Commission routinely accepts the ALJ decision as its own, and to the extent it hears the appeal, it relies heavily on its ALJ's findings of fact and conclusions of law.

92.     Indeed, as illustrated in this case, any facts found by the ALJ, and adopted by the Commission, are deemed "conclusive" so long as they are premised on "substantial evidence." *Steadman v. SEC*, 450 U.S. 91, 97 n. 12 (1981).

93.     The Court in *Lucia* held that the "'appropriate' remedy for an adjudication tainted with an appointments violation is a new 'hearing before a properly appointed' official …. To cure the constitutional error, another ALJ (or the Commission itself) must hold the new hearing to which Lucia is entitled." 138 S. Ct. at 2055.

94.     On September 12, 2018, Chief Administrative Law Judge Brenda P. Murray assigned this matter to Administrative Law Judge Carol Fox Foelak and ordered that by no later than October 3, 2018, ALJ Foelak issue an order directing the parties to submit proposals for the conduct of further proceedings.

95.     On October 2, 2018, ALJ Foelak ordered plaintiffs and the SEC Division of Enforcement to submit "a joint proposal for the conduct of further proceedings by November 30, 2018."

96.     ALJ Foelak's statutory protections against removal continue to violate Article II of the United States Constitution. *See Free Enter. Fund v. Public Co. Accounting Oversight Board*, 561 U.S. 477, 492 (2010).

97.     The SEC orders set forth above violate their own rules, procedures and deadlines and thus deprive plaintiffs of their rights to due process under law. *See United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954).

98.     Declaratory and injunctive relief is necessary to prevent Plaintiffs from being compelled to submit—yet again—to an unconstitutional proceeding and from suffering further irreparable professional, reputational and financial harm—all without meaningful judicial review.

99.     In the event that these unlawful administrative proceedings result in adverse findings against plaintiffs, the ALJ's and/or Commission findings would be given substantial deference, even "especially deferential" review "entitled to the greatest weight," *Lucia*, 832 F.3d at 289, 295, entrenching the harm caused by the SEC's unconstitutional proceedings.

100.    Without the requested declaratory and injunctive relief, Plaintiffs will suffer irreparable harm by being forced to undergo—for the second time—an expensive, time-consuming, reputation-destroying, unconstitutional proceeding.  Judicial review after that unconstitutional proceeding has already taken place cannot and does not provide meaningful judicial review.

## CAUSES OF ACTION

### COUNT ONE
**(Application for Preliminary Injunctive Relief)**

**(The Administrative Proceedings Violate Article II of the United States Constitution)**

101.    Plaintiffs repeat and reallege each and every allegation of the preceding paragraphs above, as if fully set forth herein.

102.    SEC ALJs may only be removed for good cause as determined by the Merit Systems Protection Board (MSPB), 5 U.S.C. § 7521(a), whose members themselves can only be removed by the President for good cause. 5 U.S.C. § 1202(d).  SEC Commissioners, who have powers of appointment over ALJs, cannot act without approval from MSPB and themselves enjoy for-cause protection against removal.  *MFS Sec. Corp. v. SEC*, 380 F. 3d 611, 619-20 (2d Cir. 2004).

103.     These multiple layers of tenure protection violate Article II of the United States Constitution.

104. Without injunctive relief from this Court, Plaintiffs Mr. Lucia and RJL will be required to submit to an unconstitutional proceeding. This in and of itself constitutes irreparable harm to plaintiffs unless the SEC's re-instituted administrative proceeding is enjoined.

105. Furthermore, if the SEC, upon recommendation from the ALJ, finds against Mr. Lucia and RJL, the harm will be severe and irremediable. Mr. Lucia has already been industry-barred for five years, has suffered irreversible business and financial losses, reputational damage, over a million dollars in defense costs, and suffered grave harm to his health and well-being. Plaintiffs are unable under the SEC's administrative adjudication scheme to obtain meaningful judicial review in time to prevent this outcome. Nor can this harm be remedied with after-the-fact money damages, as these are irreversible and non-compensable losses. Mr. Lucia is already out of business, out of money, in impaired health, irreparably reputationally damaged, and out of hope for fair treatment by his government.

106. Plaintiffs have a substantial likelihood of success on the merits of their claims. The harm to Plaintiffs far outweighs any harm, or even inconvenience, to the SEC, if such relief is granted. Plaintiffs have filed this action as early in the proceedings as possible, before any substantial government resources or time has been expended on the re-prosecution of the administrative proceeding. Finally, the grant of an injunction will serve the public interest by protecting Americans' constitutional rights, just as Mr. Lucia and RJL did in the hard-fought and costly first round of this proceeding.

## COUNT TWO

**(Declaratory and Injunctive Relief)**

**(The Administrative Proceedings Violate Article II of the United States Constitution)**

107.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs above, as if more fully set forth herein.

108.    SEC ALJs may only be removed for good cause as determined by the Merit Systems Protection Board (MSPB), 5 U.S.C. § 7521(a), whose members themselves can only be removed by the President for good cause. 5 U.S.C. § 1202(d).  SEC Commissioners, who have powers of appointment over ALJs, cannot act without approval from MSPB and are themselves protected by for-cause protection against removal.  *MFS Sec. Corp. v. SEC*, 380 F. 3d 611, 619-20 (2d Cir. 2004).

109.    These multiple layers of tenure protection violate Article II of the United States Constitution.

## COUNT THREE

### (Declaratory and Injunctive Relief)

### (The SEC's Reinstituted Administrative Proceedings Violate Constitutionally Required Deadlines)

110.    Plaintiffs repeat and reallege each and every allegation in the preceding paragraphs above, as if more fully set forth herein.

111.    The SEC's reinstituted administrative proceeding violates its own rules of practice and their mandatory deadlines.  If an agency disregards rules governing its behavior this deprives an affected entity of the constitutionally guaranteed "due process." *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 268 (1954). These principles, often referred to generally as the "*Accardi* doctrine," are so fundamental that an agency's disregard of rules that "afford greater procedural protections" upon parties will void agency action even without a showing of prejudice. *Vitarelli v. Seaton*, 359 U.S. 535, 539 (1959).

112.   The Commission had to commence its hearing within 60 days from the issuance of the OIP.  This 60-day deadline was statutorily required. 15 U.S.C. §§ 78u-3(b), 80b-3(k). It was also required by the Commission's rules of practice. 17 C.F.R. § 201.360(a)(2)(ii). And a properly-appointed ALJ was required to issue a decision no later than 120 days after the hearing. 17 C.F.R. § 201.360(a)(2)(i). Under the *Accardi* doctrine, due process therefore requires adherence to these deadlines.

113.   But today, more than six years after the OIP was issued, there has never been a proper hearing before an administrative law judge, and there has been no proper decision on the merits. The OIP is, in essence, expired.  This voids the SEC's action against Mr. Lucia regardless of prejudice to him. *See Vitarelli*, 359 U.S. at 539.

114.   The prejudice to Mr. Lucia and RJL is also overwhelming.  The conduct in this case occurred many years ago, and it will be difficult if not impossible to find witnesses who actually remember the seminars, let alone the individual slides.  The Division is unlikely to carry its burden of proof, and Mr. Lucia is undeniably hampered in presenting his defense.

115.   Although the SEC could have brought proceedings either in an Article III district court or before the Commission, it chose to bring them before an unconstitutionally unappointed ALJ. Even after this was brought to the SEC's attention, it dug in and maintained a litigation position so erroneous, that the Department of Justice took the extraordinary step of confessing error before the Supreme Court.  Having clung to its erroneous position that the ALJ was properly appointed, the SEC must live with the consequences of having dragged plaintiffs through such a costly and extended prosecution which it brought before an improperly installed ALJ, Cameron Elliot.

116.    *Accardi* requires that the Commission follow its own rules, and having elected an unconstitutional proceeding, it may not now—some six years later—commence a new proceeding under the expired OIP.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for an Order and Judgment:

Declaring unconstitutional the statutes, regulatory provisions guidance and policies providing for the removal of SEC ALJs;

Enjoining the SEC from carrying out an administrative proceeding against Mr. Lucia and RJL, or any other administrative proceedings against Plaintiffs based upon the expired OIP;

Providing such other and further relief as this Court may deem just and proper, including reasonable attorney's fees and costs of this action.

Dated: November 28, 2018

By:    _/S/ Mark J. Perry_____

    Mark J. Perry, CA Bar No. 212532
    Gibson, Dunn & Crutcher LLP
    1050 Connecticut Ave. NW
    Washington, DC 20036-5306
    Telephone: 202-887-3667
    Email: MPerry@gibsondunn.com


    Margaret A. Little (*pro hac vice pending*), CT Bar No. 303494
    Caleb Kruckenberg (*pro hac vice pending*), PA Bar No. 322264
    New Civil Liberties Alliance
    1225 19th St. NW, Suite 450
    Washington, DC 20036
    Telephone: 202-869-5210
    Email: peggy.little@ncla.legal
    Email: caleb.kruckenberg@ncla.legal

*Attorneys for Plaintiffs Raymond J. Lucia Companies, Inc.*
*and Raymond J. Lucia, Sr.*